**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MICHIGAN**

**SOUTHERN DIVISION**

| | |
|---|---|
| **GLENDA CANFIELD,**<br>an individual,<br><br>*Plaintiff,*<br><br>vs.<br><br>**CONSUMERS ENERGY COMPANY,**<br>a Michigan Corporation,<br>and<br><br>**JEFFERY GARANT,**<br>an individual,<br><br>*Defendants.* | Case No.<br><br>Hon.<br><br><br><br><br><br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

________________________________________/

Plaintiff, GLENDA CANFIELD, by and through her attorneys, DILLON & DILLON, P.L.C., hereby makes the following Complaint and Demand for Jury Trial against Defendants CONSUMERS ENERGY COMPANY and JEFFERY GARANT:

## COMPLAINT

## JURISDICTION

1. Plaintiff GLENDA CANFIELD ("Plaintiff" or "CANFIELD") is an individual residing in Jackson County, State of Michigan.

2. Defendant CONSUMERS ENERGY COMPANY ("Consumers Energy" or "the Company") is a Michigan corporation with its principal place of business located at One Energy Plaza, Jackson, Michigan 49201.

3. Defendant JEFFERY GARANT ("Defendant Garant" or "GARANT") is an individual who, at all times relevant to this Complaint, was employed by Consumers Energy as a manager in its Information Technology organization, was Plaintiff's direct supervisor, and exercised direct supervisory authority over Plaintiff, including the authority to evaluate, counsel, discipline, and terminate her employment and to determine the terms and conditions of her employment and compensation. Upon information and belief, GARANT resides in Washtenaw County, Michigan. GARANT's business address is One Energy Plaza, Jackson, Michigan 49201.

4. Consumers Energy and Defendant Garant are referred to collectively as "Defendants."

5. At all times relevant to this Complaint, Consumers Energy employed well in excess of 500 employees and was an "employer" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12111(5); the Michigan Persons with Disabilities Civil Rights Act, MCL 37.1201(b); and the Elliott-Larsen Civil Rights Act, MCL 37.2201(a).

6. At all times relevant to this Complaint, Defendant Garant was an agent of Consumers Energy and, as such, was an "employer" within the meaning of the Persons with Disabilities Civil Rights Act, MCL 37.1201(b), and the Elliott-Larsen Civil Rights Act, MCL 37.2201(a), each of which defines "employer" to include an agent of the employer, and a "person" within the meaning of MCL 37.1103(g) and MCL 37.2103(g). Plaintiff asserts her claims against Defendant Garant individually only under Michigan law.

7. This Court has jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331, and 42 U.S.C. § 12117(a). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 and the principles of pendent jurisdiction, because those claims arise out of the same nucleus of operative facts as the federal claims.

8. The unlawful employment practices complained of in this Complaint occurred within the Eastern District of Michigan, Consumers Energy maintains its principal place of business in this District, and venue is proper in this District pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).

9. On or about August 11, 2026, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), Charge No. 471-2026-07247, against Consumers Energy alleging disability discrimination, harassment, and retaliation, and requested that the Charge be dual-filed with the

appropriate State agency. On August 14, 2026, the EEOC issued a Notice of Right to Sue on that Charge. This Complaint is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue.

10. Plaintiff has satisfied all administrative prerequisites to the filing of her federal claims. No administrative exhaustion is required for Plaintiff's claims under Michigan law.

## GENERAL ALLEGATIONS

### Ms. Canfield's Background and Exemplary Performance

11. Plaintiff Glenda Canfield is a 50-year-old woman who was 49 years old at the time of her termination.

12. Ms. Canfield is a highly experienced enterprise virtualization engineer with more than twenty years of experience designing, deploying, and supporting Citrix and VMware environments, including senior engineering, architecture, and consulting positions with Hewlett-Packard, Cingular Wireless, Kaiser Permanente, Rockwell Automation, and Zale Corporation.

13. Ms. Canfield has been diagnosed with Autism Spectrum Disorder ("ASD"), a lifelong neurodevelopmental condition, and with Complex Post-Traumatic Stress Disorder ("CPTSD"), which was diagnosed on or about June 6, 2023.

14. Ms. Canfield's ASD and CPTSD are physical and mental impairments that substantially limit one or more of her major life activities, including without

limitation interacting with others, communicating, sleeping, concentrating, and thinking, as well as the major bodily functions of her brain and neurological system. Among other things, Ms. Canfield experiences sensory sensitivity that can trigger migraines and headaches; difficulty perceiving non-verbal social cues such as body language and facial expressions; difficulty processing emotionally charged information in real time in meetings and verbal confrontations; and, when subjected to prolonged stress, autistic "meltdowns" in which her nervous system becomes overwhelmed.

15. On December 6, 2021, Consumers Energy hired Ms. Canfield as an IT Technical Senior Analyst II at an annual salary of $131,016. Consumers Energy's own hiring records reflect that the hiring leader extended that offer "due to level of expertise." Ms. Canfield was hired to work remotely and initially did so from her home in Texas.

16. Effective August 16, 2022, Consumers Energy promoted Ms. Canfield to the position of Platform Engineer in Consumers Energy's Virtual Desktop group within its IT organization.

17. At all relevant times, Ms. Canfield's direct supervisor was Defendant Garant, who also authored each of her annual performance evaluations, known within Consumers Energy as the Performance Evaluation and Feedback Discussion ("PEFD").

18. In her 2022 PEFD, Consumers Energy rated Ms. Canfield "Highly Effective." Mr. Garant wrote that she helped the team overcome the hurdles of its Citrix Cloud implementation "by using our third party partners, vendors as well as her knowledge and expertise," and that she "has proved to be a valuable asset and addition to our team."

19. Consumers Energy awarded Ms. Canfield merit increases in each subsequent year, raising her salary to $134,088 effective April 1, 2023; to $138,120 effective April 1, 2024; and to $142,272 effective April 1, 2025.

20. In her 2024 PEFD, Consumers Energy again rated Ms. Canfield "Highly Effective." Mr. Garant wrote that Ms. Canfield completed the Citrix Cloud migration "ahead of schedule," that she "demonstrated both Ownership and Caring," that she created knowledge articles and training material and coached other groups, that she met her metrics targets, and that she "demonstrated all of our culture values in 2024." Mr. Garant concluded that Ms. Canfield "has continued to be a valuable asset to the Citrix team. Her knowledge and experience has helped us navigate the constant changing current of our Citrix platform and vendors. She will be vital to helping us determine our long term strategy for VDI."

21. Prior to September 17, 2025, Ms. Canfield had never received any discipline, counseling, or negative performance evaluation during her employment with Consumers Energy.

## The Return to Office and the Exposure of Ms. Canfield's Disabilities

22. In 2024, Consumers Energy issued a return-to-office directive. Ms. Canfield relocated from Texas to Michigan and, beginning in or about November 2024, began reporting to Consumers Energy's Jackson, Michigan offices in person.

23. Ms. Canfield's autism quickly became apparent to her co-workers once she began working on-site. Her sensory sensitivities were known within the department, and co-workers used them to obtain changes in office conditions they themselves desired, for example by stating that "we need to change the lighting for Glenda."

24. In early 2025, Ms. Canfield gave a small item she had among her belongings, a t-shirt, to co-worker John Dykstra. Mr. Dykstra subsequently told others that Ms. Canfield had specifically purchased the item for him. Ms. Canfield, consistent with the intolerance of factual inaccuracy that is a common characteristic of persons with autism, corrected Mr. Dykstra's account.

25. Mr. Dykstra thereafter reported the interaction to management, and the matter was routed to Consumers Energy's People & Culture and/or Ethics & Compliance functions. Upon information and belief, Mr. Dykstra's report was made in coordination with, and at the encouragement of, Andrew ("Andy") Smith, a long-tenured member of the department.

26. Upon information and belief, Consumers Energy conducted an investigation of Mr. Dykstra's report in which it interviewed many members of the department, and then closed that investigation without ever interviewing Ms. Canfield, informing her of the substance of the allegations against her, or affording her an opportunity to respond to them. Upon information and belief, the allegations included an assertion that Ms. Canfield had reported Mr. Dykstra.

27. Following the investigation, a false narrative circulated within the department, upon information and belief at the instance of Mr. Dykstra, that Ms. Canfield had initiated a complaint against Mr. Dykstra and had then been dishonest about it. Mr. Garant repeated that narrative and characterized Ms. Canfield as a "liar" for failing to "own" conduct she had not engaged in.

28. Ms. Canfield was thereafter subjected to ongoing harassment by co-workers. Among other things, co-worker Thomas Locke repeatedly called Ms. Canfield a liar in front of the team and would leave the room when she entered, announcing that he could not be around her. When Kimberly Scott, the IT Director over the department, and People & Culture inquired about Mr. Locke's conduct, team members declined to support Ms. Canfield.

29. Ms. Canfield's communication style, her literal and precise manner of speech, her difficulty reading social context, and her reactions to the stress of being ostracized, all of which are manifestations of her autism and CPTSD, were treated

by her co-workers and management not as characteristics of a disability but as evidence that she was dishonest, "highly reactive," and untrustworthy.

**Ms. Canfield Discloses Her Disabilities and Requests Accommodation**

30. In response to the harassment, on or about April 15, 2025, Ms. Canfield formally disclosed her ASD and CPTSD to Consumers Energy and initiated a request for reasonable accommodation through Alight, Consumers Energy's third-party leave and accommodation administrator.

31. In connection with that process, Consumers Energy's People & Culture function required Ms. Canfield to "prove" that she was autistic.

32. On or about May 2, 2025, Ms. Canfield's treating provider submitted Consumers Energy's Accommodation Request Assessment Form, which confirmed that Ms. Canfield has ASD and Complex PTSD; that those impairments substantially limit her major life activities of interacting with others and sleeping, and cause sensory sensitivity; that her ability to perform the essential functions of her position is limited without accommodation; and that she required, as an accommodation, a schedule in which she reported to the office only one day per week to reduce sensory overload and the social anxiety and emotional fatigue caused by interaction with co-workers.

33. On or about May 8, 2025, Consumers Energy approved an accommodation permitting Ms. Canfield to work remotely four days per week and on-site one day per week.

34. Also in or about May 2025, during a call regarding Ms. Canfield's situation on which Ms. Scott and People & Culture Business Partner Grace Williams were present, Mr. Garant screamed during the call, after which Ms. Williams asked Ms. Canfield to leave the call.

35. While the accommodation reduced some of Ms. Canfield's direct interaction with her harassers, the harassment, false narrative, and hostile treatment continued.

**Ms. Canfield Complains of Discrimination, Harassment, and Retaliation**

36. Between approximately June 18 and June 26, 2025, Ms. Canfield submitted complaints to Consumers Energy's People & Culture and Ethics & Compliance functions regarding disability discrimination, harassment, retaliation, and the unfairness of the investigation process to which she had been subjected.

37. On July 1, 2025, Ms. Canfield asked Ms. Williams whether her position could be designated fully remote so that she would not have to repeatedly re-certify her disability through Alight every six months. Ms. Williams initially responded that she had a "positive response," but on July 15, 2025, informed Ms. Canfield that "the reason that supports your request is related to an ADA covered

circumstance," and that her request would have to be re-submitted through Alight with additional medical documentation.

38. In response, on July 15, 2025, Ms. Canfield explained to Ms. Williams in writing that being on-site subjected her to "hostility and isolation because of the malicious actions of both management and multiple coworkers on my team"; that she did "not feel safe in the office"; that she was being followed around the facility by "facilities" staff; that "[a]s an autistic person being completely cut off from context data like body language or micro facial expressions that help me comprehend intent and context puts me at a disadvantage and leaves me vulnerable"; and that "[m]y autism did not create this situation, it's just a convenient vehicle for the company to use to avoid even a remote appearance of liability for the culture that allowed this type of situation to breed." Ms. Canfield wrote that she "literally fe[lt] completely abandoned by this company."

39. On or about July 16, 2025, as a result of the emotional strain caused by the ongoing harassment, Ms. Canfield took time off from work.

40. During a one-on-one meeting with Mr. Garant on or about July 23, 2025, Ms. Canfield informed Mr. Garant that she was struggling with her executive functioning as a result of the conduct of Mr. Dykstra and requested that her interactions with Mr. Dykstra be limited to critical meetings only. Mr. Garant agreed to facilitate that request but failed to do so.

41. During a one-on-one meeting with Mr. Garant on or about August 6, 2025, Ms. Canfield informed Mr. Garant that, because of the continued interactions with Mr. Dykstra, she had been required to see her physician to increase her anxiety medication and to obtain sleep medication.

**The Master Image Failures and Ms. Canfield's Escalation to the Vice President**

42. In 2025, Ms. Canfield was responsible for migrating Consumers Energy's on-premises Citrix users to Consumers Energy's Microsoft Azure environment. That work depended on "master images" that were exclusively controlled by Mr. Dykstra.

43. Ms. Canfield had repeatedly requested that she and her Citrix peer be given ownership of the master images, a task that she was fully capable of performing, so that the migration would not be dependent on Mr. Dykstra. Consumers Energy did not grant that request.

44. Throughout mid-2025, Ms. Canfield experienced a series of unprecedented master image failures that specifically impaired her ability to deploy persistent virtual machines in Azure, which halted her migration of users into testing and production. Ms. Canfield documented that the failures recurred following her interactions with Mr. Dykstra and repeatedly reported the pattern to Mr. Garant, who stated he would follow up but did not.

45. On or about September 2, 2025, after an exchange with Mr. Garant in which Mr. Garant accused Ms. Canfield of "creating a compliance issue" for raising her concerns, and in which it became clear to Ms. Canfield that Mr. Garant was not a neutral party in her dispute with Mr. Dykstra, Ms. Canfield suffered an autistic meltdown. She notified Mr. Garant and her Citrix peer that she would be out for the remainder of the week. Only after that meltdown did Mr. Garant remove Mr. Dykstra from Ms. Canfield's project.

46. During a department meeting on or about September 3, 2025, Ms. Canfield raised the master image failures. Mr. Dykstra responded by asserting that Ms. Canfield herself had caused the failures by pointing persistent machine catalogs at a non-persistent image. Ms. Canfield promptly provided Mr. Garant with screenshots demonstrating that Mr. Dykstra's assertion was false. Upon information and belief, Mr. Dykstra was never counseled for making that false statement.

47. On or about September 3 and 4, 2025, Ms. Canfield escalated her concerns, including the conduct of Mr. Garant, the ongoing mistreatment she was experiencing, and the Azure environment failures and dependency risks impeding the migration, to James ("Jim") Beechey, Consumers Energy's Vice President of IT & Security.

48. Mr. Beechey verbally acknowledged the issues and, following Ms. Canfield's escalation, Mr. Dykstra was moved from Mr. Garant's reporting line to that of Mr. Smith. However, the conduct of which Ms. Canfield complained continued.

**The First Counseling in Ms. Canfield's Tenure**

49. On September 17, 2025, approximately two weeks after Ms. Canfield escalated her concerns about Mr. Garant to the Vice President, Mr. Garant, with Ms. Williams present, issued Ms. Canfield a "Documentation of Counseling Session," the first counseling of any kind in her nearly four years of employment.

50. The counseling document contained no measurable performance standards. Instead, it faulted Ms. Canfield for, among other things:

a. "Attendance and reliability concerns," including "[t]aking unscheduled time off following difficult conversations," which referred to the time Ms. Canfield took off following her disability-related autistic meltdown;

b. "Ended chats and meetings abruptly when discussions were unfavorable" and "[d]ropped without notice" from virtual meetings, behaviors that arise from Ms. Canfield's documented difficulty processing emotionally charged information in real time;

c. Leaving an informal, ad hoc chat group that Ms. Canfield left in order to limit contact with Mr. Dykstra, as she had previously asked Mr. Garant to arrange;

d. "Emotionally charged accusations" during the September 3, 2025 meeting, at which Ms. Canfield raised the master image failures and Mr. Dykstra made a demonstrably false statement about her work;

e. "Unsubstantiated accusations" and "[a]lleged conspiracies involving colleagues, peers, and leadership," which referred to the very harassment and mistreatment Ms. Canfield had reported to People & Culture, Compliance, and the Vice President;

f. Having "[q]uestioned the legitimacy of compliance investigations" and having "[e]xpressed skepticism about investigation fairness"; and

g. Statements Ms. Canfield made in private conversations with a trusted colleague in which she tried to understand why male co-workers were treating her as they were.

51. The counseling document directed Ms. Canfield to "[e]ngage in stress management resource via Spring Health," to participate in a "restorative process" with the co-workers who had harassed her, and to "notify leadership when you have unexpected needs that require you to dismiss yourself without notice from

virtual or in-person team meetings." The document stated: "This performance concern will be documented in your 2025 PEFD."

52. Ms. Canfield requested five business days to respond in writing, noting that the issues had surfaced only after her September 2, 2025 exchange with Mr. Garant and that the document read as "a shotgun approach of accusations."

53. Ms. Canfield thereafter submitted a detailed written rebuttal. In it, she disputed the factual allegations point by point with supporting documentation; reminded Mr. Garant that he and the Company knew she has autism and CPTSD; explained that the time off cited in the counseling followed an autistic meltdown caused by stress that she had reported to Mr. Garant and that he had failed to address; explained the connection between her disabilities and her need to leave meetings when she could not process highly charged information; offered to obtain "an official accommodation from my doctor allowing me to leave meetings if I need to because I am unable to process the information immediately"; identified the selective and targeted enforcement of rules against her; and expressly stated that the counseling was "workplace retaliation" and "an overt attempt at retaliation."

54. Consumers Energy did not respond to Ms. Canfield's offer to obtain an accommodation permitting her to leave meetings, and did not engage in any

interactive process regarding the disability-related behaviors cited in the counseling.

55. Consumers Energy received Ms. Canfield's written rebuttal and supporting screenshots, but it never provided her with any findings regarding the disputed allegations, never informed her whether her evidence had been reviewed, and never explained how any disputed allegation had been resolved. On November 17, 2025, two months after receiving the rebuttal, Ms. Williams answered a separate question Ms. Canfield had asked in September, acknowledging that "[i]t seems I did not respond to your question back in September," but said nothing about the substance of the rebuttal. On November 18, 2025, rather than reporting any findings, Ms. Williams described the counseling as "non disciplinary," cautioned Ms. Canfield regarding her comments about Defendant Garant, and invited her to submit further details. Consumers Energy nonetheless relied on the same disputed allegations in Ms. Canfield's 2025 PEFD and in its decision to terminate her employment.

56. On September 22, 2025, Ms. Canfield requested that "any communication regarding the items reviewed be in writing so that I can review and respond with deliberation," explaining that she was "worried that I will not be able to mask appropriately in a call or in person meeting." On September 23, 2025, Ms. Williams responded that she was willing to have Mr. Garant document and

summarize meetings in writing, but in the same message warned Ms. Canfield: "Please be aware that we have provided you with documented counseling on your behavior that if continued could lead to disciplinary action."

57. When Ms. Canfield asked that the counseling not be included in her PEFD, Ms. Williams responded that the counseling "would be considered observations of behavior and results" for purposes of the PEFD.

58. Ms. Canfield thereafter submitted an amended accommodation request, and Consumers Energy approved an expanded accommodation requiring that Ms. Canfield receive written communication and at least twenty-four hours' advance notice of high-stress meetings.

**The MRV Pay-Band Change**

59. On or about September 26, 2025, shortly after Ms. Canfield's request for additional accommodation, Consumers Energy implemented changes to its market reference values ("MRV") and pay bands affecting the Platform Engineer position, and identified Ms. Canfield as being outside the pay band for her position. Consumers Energy's own records reflect that, effective October 1, 2025, Ms. Canfield's pay-scale group was changed from 210-AI to 210-AE.

60. Upon information and belief, other Platform Engineers whose salaries fell outside the revised pay band promptly received title changes that placed them

within an appropriate band and preserved their eligibility for merit increases. Ms. Canfield did not receive a title change.

61. Upon information and belief, as a result, Ms. Canfield alone was rendered ineligible for the merit increases that other similarly situated Platform Engineers remained eligible to receive. Ms. Canfield's belief is based on, among other things, Consumers Energy's refusal to answer her repeated questions about whether any other Platform Engineer was similarly affected, and Ms. Williams's statement that the MRV change "impacted the role of platform engineer" and "was not an individual change." The compensation and classification records of the other affected employees are within Consumers Energy's exclusive possession.

62. Ms. Canfield repeatedly asked Consumers Energy, including Ms. Scott, whether any Platform Engineer other than herself was outside the pay band and had not received an immediate title change. Consumers Energy never answered that question.

**Consumers Energy Moves the Goalposts**

63. Ms. Canfield's Azure migration was scheduled to be completed in or about May 2026. On or about October 29, 2025, Ms. Canfield informed Mr. Garant in writing that the Azure West non-production environment could not yet be started because infrastructure builds by other teams had not been completed and the environment was not ready.

64. After Ms. Canfield documented those dependency blockers, Mr. Garant replaced one of Ms. Canfield's existing 2025 goals with a new goal to "Complete the Citrix West buildout and Testing by October 31, 2025," a deadline that had already effectively passed and that could not be met for reasons outside Ms. Canfield's control. A scheduled meeting regarding the goal was canceled, and no correction was issued.

65. On or about December 30, 2025, the new goal was marked 0% complete.

**Ms. Canfield's Continued Protected Activity**

66. On November 18, 2025, Ms. Canfield wrote to Ms. Williams and Mr. Garant that the counseling was "baseless and purely retaliation for a protected action," and that the MRV change "was another example of retaliation," and again asked how many Platform Engineers were outside the pay band and how many of them received immediate title changes.

67. Ms. Williams responded the same day that she was "not aware of any discussion with you regarding retaliation for a protected action," that the MRV change "was not an individual change," and that "I need to caution you regarding your comments regarding Jeffrey without fact-based evidence of such concerns."

68. That evening, Ms. Canfield forwarded the exchange to Vice President Beechey, writing that she was "exhausted from being persistently gaslit," and asking: "When will there be a resolution to this situation? I want to be able to do

perform my work in peace without constantly worrying about the next sideways attack from my own manager or team members."

69. On or about January 12 and 13, 2026, Ms. Canfield raised with Consumers Energy her concern that her upcoming annual review would be biased and retaliatory.

70. On January 15, 2026, Ms. Canfield raised her concerns directly with IT Director Kimberly Scott, again raised the MRV disparity, stated her concern that she was being retaliated against, stated that she did not want to meet one-on-one with Mr. Garant because she did not trust him, and affirmed: "I'm not quitting my job."

71. At 9:42 p.m. on January 15, 2026, Ms. Canfield sent an email to Ms. Scott, Mr. Garant, and Ms. Williams again asking whether she was the only Platform Engineer financially affected by the MRV change, and stating: "I want reassurance that this was not retaliation for me going to Jim Beechey and reporting Jeff Garant's actions."

**Ms. Canfield Is Terminated the Next Morning**

72. The next morning, January 16, 2026, Mr. Garant delivered Ms. Canfield's 2025 PEFD, rating her "Needs Improvement," the first negative performance rating of her career with Consumers Energy. Consumers Energy terminated Ms. Canfield's employment the same day.

73. Consumers Energy did not provide Ms. Canfield with the twenty-four hours' advance notice of high-stress meetings required by her approved accommodation before the January 16, 2026 meeting, even though that meeting, in which, upon information and belief, People & Culture and senior management participated, was the meeting at which Consumers Energy delivered her first negative performance rating and terminated her employment, and even though Ms. Canfield had told Ms. Scott the day before that she did not want to meet one-on-one with Defendant Garant.

74. Ms. Canfield's 2025 PEFD acknowledged that she completed her Azure training, that she helped create the migration dashboard, that "[t]he migration targets were met through 2025 excluding December," and that the migration posed challenges that were "heavily reliant on our network or security teams."

75. The 2025 PEFD nonetheless criticized Ms. Canfield for "frequent unsubstantiated accusations toward colleagues," "emotionally charged comments during meetings," "leaving important group chats and meetings," and "persistent mistrust of coworkers and leadership." The PEFD expressly faulted Ms. Canfield because she "questioned compliance processes" and for "expressing concerns about fairness and questioning processes in ways that contributed to tension within the group."

76. Although Consumers Energy's PEFD process requires a Performance Correction Plan for an employee whose performance is deficient, Consumers Energy never placed Ms. Canfield on a Performance Correction Plan or any other improvement plan prior to her termination.

77. Consumers Energy's termination letter, signed by Mr. Garant, stated that the decision was "based on ongoing concerns regarding workplace behavior," specifically "repeated unfounded accusations toward coworkers and leadership, resistance to constructive feedback, and behaviors that have created an environment of mistrust and discomfort among team members," which "continued despite prior counseling and opportunities for improvement." The "prior counseling" was the September 17, 2025 counseling that Consumers Energy had characterized as "non disciplinary." The termination letter repeated, in substantially the same terms, the disputed allegations of the September 17, 2025 counseling, and, upon information and belief, no one at Consumers Energy independently evaluated Ms. Canfield's written rebuttal of those allegations before the termination decision was made.

78. During the termination meeting, Ms. Canfield was told that she was being terminated because she depended too heavily on the "Microsoft Team," which was in substance Mr. Dykstra, and because her poor relationship with that team made it impossible for her to do her job. Ms. Canfield was dependent on Mr. Dykstra only

because Consumers Energy had refused her repeated requests to give her ownership of the master images.

79. The reasons Consumers Energy gave for the 2025 PEFD rating and the termination were false and pretextual. The "accusations" for which Ms. Canfield was terminated were her complaints of harassment, discrimination, and retaliation, and her reports of conduct impeding her work; the "mistrust" for which she was terminated was the predictable product of the harassment she had reported; and the "behaviors" for which she was terminated were manifestations of the very disabilities for which Consumers Energy had already approved accommodations.

80. Consumers Energy offered Ms. Canfield sixteen weeks of severance pay conditioned upon her execution of a general release of claims, terminated her health insurance, limited her access to Spring Health mental health services to thirty days, and declared her ineligible for future employment with Consumers Energy or any CMS Energy subsidiary.

81. Upon information and belief, Consumers Energy has treated non-disabled employees who did not engage in protected activity more favorably than Ms. Canfield, including by not subjecting them to counseling, negative evaluations, or termination for comparable or more serious conduct, such as making false statements in meetings, and by granting them title changes in connection with the MRV pay-band changes.

**Consumers Energy's Personnel File Production**

82. On January 23, 2026, Plaintiff's counsel served Consumers Energy with a written demand for a complete copy of Ms. Canfield's personnel record pursuant to the Bullard-Plawecki Employee Right to Know Act, MCL 423.501 et seq., together with a demand that Consumers Energy preserve all documents and electronically stored information relating to Ms. Canfield's employment.

83. On or about February 19, 2026, Consumers Energy produced a 101-page Bates-stamped document that it represented to be Ms. Canfield's personnel file.

84. Consumers Energy's production omitted records that were kept by Consumers Energy, identify Ms. Canfield, and have been used, or may affect or be used, relative to her qualifications for employment, promotion, transfer, additional compensation, or disciplinary action, including without limitation: non-medical records of Ms. Canfield's accommodation requests and Consumers Energy's approval of them; Ms. Canfield's 2023 PEFD; records relating to the MRV pay-band change and Consumers Energy's decision not to change Ms. Canfield's title; records relating to the modification of Ms. Canfield's 2025 performance goals; and the calibration, review, and approval records underlying her 2025 PEFD rating and her termination.

## Ms. Canfield's Sex and Age

85. Ms. Canfield is a woman. She was born in 1976 and was 49 years old at the time of her termination, less than two months before her fiftieth birthday.

86. Ms. Canfield worked in a male-dominated technical department. Upon information and belief, during 2025 Ms. Canfield was one of only two full-time female employees, as opposed to contractors, reporting to Defendant Garant, and the co-workers, peers, and managers involved in the conduct described in this Complaint, including Mr. Dykstra, Mr. Locke, Mr. Smith, and Defendant Garant, were men.

87. Upon information and belief, the only other full-time female employee on Defendant Garant's team requested to be transferred away from his supervision at or about the time of Ms. Canfield's termination because of the manner in which he treated her, including by taking credit for her work.

88. Ms. Canfield perceived that the hostility directed at her by male co-workers was motivated in part by her sex, and in confidential conversations with a trusted colleague she described the conduct of those co-workers as reflecting a "male chauvinist" attitude toward women. Rather than investigating whether Ms. Canfield was being subjected to sex-based hostility, Defendant Garant included those confidential remarks in the September 17, 2025 counseling as an example of Ms. Canfield's own misconduct.

89. In the counseling, the 2025 PEFD, and the termination decision, Defendants repeatedly characterized Ms. Canfield's reports, complaints, and disagreements as "emotionally charged," "disruptive," and "condescending," and as creating "discomfort" among her co-workers. Those characterizations reflect sex-based stereotypes that a woman who forcefully raises complaints or disagrees with male colleagues is emotional, difficult, and divisive, rather than assertive and correct.

90. Upon information and belief, male employees who engaged in comparable or more serious conduct were not counseled, criticized, rated "Needs Improvement," or terminated. Among other things, Mr. Dykstra made a demonstrably false statement about Ms. Canfield's work in a department meeting and was not counseled; Mr. Locke repeatedly called Ms. Canfield a liar in front of the team and was not disciplined; and, when Ms. Canfield escalated her complaints, Mr. Dykstra was moved to another manager's reporting line rather than disciplined, while Ms. Canfield received her first counseling.

91. Ms. Canfield was the most experienced Citrix engineer on Defendant Garant's team, with more than twenty years of experience in the field, and, upon information and belief, was among the most highly compensated members of the team.

92. Notwithstanding that experience, Defendant Garant directed Ms. Canfield in the September 17, 2025 counseling to "[c]omplete training on Microsoft OS and

Citrix to improve technical independence," and the 2025 PEFD faulted her for depending on the knowledge of other team members and for disagreeing that additional training would help. Those criticisms reflect age-based stereotypes that an older, long-tenured technical employee is resistant to change, unable to adapt to new technology, and resistant to feedback.

93. Upon information and belief, substantially younger employees, including substantially younger Platform Engineers affected by the MRV pay-band change, were treated more favorably than Ms. Canfield, including by receiving title changes that preserved their eligibility for salary increases and by not being counseled, rated "Needs Improvement," or terminated for comparable conduct.

94. Upon information and belief, following her termination, Ms. Canfield's job duties were assumed by, or she was replaced by, one or more substantially younger male employees.

**Damages**

95. As a result of the harassment, discrimination, and retaliation described above, Ms. Canfield suffered serious deterioration in her emotional and physical health during the last months of her employment and thereafter, including increased anxiety requiring increased medication, sleep disruption requiring sleep medication, an autistic meltdown, impaired executive functioning, emotional exhaustion, and continuing distress, for which she has received counseling.

96. Since her termination, Ms. Canfield has diligently sought comparable employment but has been unable to obtain it. Ms. Canfield's disabilities make job interviews particularly difficult for her, and her prospects of obtaining employment approaching her prior compensation are poor.

## COUNT I
## DISABILITY DISCRIMINATION
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
## 42 U.S.C. § 12101, ET SEQ.
## (AGAINST DEFENDANT CONSUMERS ENERGY COMPANY)

97. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

98. At all times relevant hereto, Plaintiff was an "employee" of Consumers Energy, and Consumers Energy was an "employer" and "covered entity" within the meaning of the Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101 et seq. ("ADA").

99. Plaintiff is an individual with a "disability" within the meaning of 42 U.S.C. § 12102 in that (a) her ASD and CPTSD are physical or mental impairments that substantially limit one or more of her major life activities and major bodily functions; (b) she has a record of such impairments, which Consumers Energy documented through its accommodation process; and (c) Consumers Energy regarded her as having such impairments, as reflected in, among other things,

Consumers Energy's acknowledgment that her requests were "related to an ADA covered circumstance."

100. Plaintiff is a "qualified individual" within the meaning of 42 U.S.C. § 12111(8). With or without reasonable accommodation, Plaintiff was able to perform, and did perform, the essential functions of the Platform Engineer position, as demonstrated by her "Highly Effective" ratings, her merit increases, and Consumers Energy's acknowledgment that her migration targets were met through 2025.

101. The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability in regard to the discharge of employees, employee compensation, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). Discrimination includes "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(b)(3).

102. Consumers Energy discriminated against Plaintiff because of her disability by, among other things:

a. Terminating her employment on January 16, 2026;

b. Issuing her a "Needs Improvement" rating in her 2025 PEFD;

c. Denying her the title change afforded to other employees affected by the MRV pay-band change, and thereby denying her salary increases;

d. Modifying her performance goals to impose a deadline she could not meet; and

e. Basing the foregoing actions on conduct that was caused by, and was a manifestation of, her disabilities, including her communication style, her difficulty processing emotionally charged interactions in real time, her need to leave meetings and conversations, her disability-related absence following an autistic meltdown, and her difficulty interacting with co-workers who were harassing her.

103. Plaintiff's disability was a but-for cause of Consumers Energy's adverse employment actions. The reasons Consumers Energy has articulated for those actions are false and a pretext for unlawful discrimination.

104. Consumers Energy acted with malice or with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages pursuant to 42 U.S.C. § 1981a(b)(1).

105. As a direct and proximate result of Consumers Energy's unlawful conduct, Plaintiff has suffered the damages described herein.

106. As a result of Consumers Energy's unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both in the past and in the future;

b. Loss of the value of benefits, including health insurance and retirement benefits, both in the past and in the future;

c. Loss of earning capacity;

d. Loss of employment and business opportunities;

e. Non-economic damages including without limitation damages for mental anguish, anxiety, stress, humiliation, embarrassment, exacerbation of her medical conditions, and damage to reputation;

f. Other injuries and damages that become known through the discovery process.

107. Plaintiff also seeks equitable relief, including back-pay, front-pay or reinstatement, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendant Consumers Energy Company in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, exemplary and punitive damages, and attorney fees as allowed by law.

## COUNT II
## FAILURE TO ACCOMMODATE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
## 42 U.S.C. § 12112(b)(5)(A)
## (AGAINST DEFENDANT CONSUMERS ENERGY COMPANY)

108. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

109. Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). Once an employee requests an accommodation, the employer is obligated to engage in a good-faith interactive process to identify an effective accommodation. 29 C.F.R. § 1630.2(o)(3).

110. Consumers Energy had actual knowledge of Plaintiff's disabilities and of the limitations they caused, through, among other things, Plaintiff's April 2025 accommodation request, her provider's May 2, 2025 certification, her July 2025 communications to Ms. Williams and Mr. Garant, her September 2025 written rebuttal, and her September 22, 2025 accommodation request.

111. Consumers Energy failed to reasonably accommodate Plaintiff and failed to engage in the interactive process in good faith by, among other things:

a. Failing to implement Plaintiff's July 2025 request, which Mr. Garant agreed to facilitate, that her interactions with Mr. Dykstra be limited to critical meetings, until after Plaintiff suffered an autistic meltdown;

b. Failing to respond to, or engage in any interactive process regarding, Plaintiff's September 2025 request for an accommodation permitting her to step away from meetings when she was unable to process highly charged information in real time, and instead treating that very behavior as misconduct;

c. Conditioning the written-communication accommodation Plaintiff requested on September 22, 2025, on a simultaneous warning that her disability-related behavior "could lead to disciplinary action";

d. Failing to provide Plaintiff the twenty-four hours' advance notice required by her approved accommodation before the January 16, 2026 meeting at which Consumers Energy delivered her 2025 PEFD and terminated her employment;

e. Counseling, rating, and ultimately terminating Plaintiff for the very limitations that her approved accommodations were designed to address, thereby rendering those accommodations illusory; and

f. Failing to consider any accommodation, such as transferring ownership of the master images to Plaintiff and her Citrix peer or

reassigning the dependency, as an alternative to terminating Plaintiff for her difficulty working with Mr. Dykstra, the co-worker whose conduct had triggered her disability-related limitations.

112. The accommodations Plaintiff requested were reasonable and would not have imposed an undue hardship on Consumers Energy.

113. Consumers Energy did not make a good-faith effort, in consultation with Plaintiff, to identify and make a reasonable accommodation, and acted with malice or with reckless indifference to Plaintiff's federally protected rights. 42 U.S.C. § 1981a(a)(3), (b)(1).

114. As a direct and proximate result of Consumers Energy's unlawful conduct, Plaintiff has suffered the damages described herein.

115. As a result of Consumers Energy's unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both in the past and in the future;

b. Loss of the value of benefits, including health insurance and retirement benefits, both in the past and in the future;

c. Loss of earning capacity;

d. Loss of employment and business opportunities;

e. Non-economic damages including without limitation damages for mental anguish, anxiety, stress, humiliation, embarrassment, exacerbation of her medical conditions, and damage to reputation;

f. Other injuries and damages that become known through the discovery process.

116. Plaintiff also seeks equitable relief, including back-pay, front-pay or reinstatement, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendant Consumers Energy Company in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, exemplary and punitive damages, and attorney fees as allowed by law.

**COUNT III**
**HOSTILE WORK ENVIRONMENT / DISABILITY HARASSMENT**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12112(a)**
**(AGAINST DEFENDANT CONSUMERS ENERGY COMPANY)**

117. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

118. The ADA prohibits an employer from subjecting an employee to harassment based on disability that is sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment.

119. From early 2025 through her termination, Plaintiff was subjected to unwelcome harassment based on her disabilities, including without limitation:

a. Being branded a "liar" by her supervisor and co-workers for conduct arising from her autistic characteristics, including her correction of factual inaccuracies;

b. Being repeatedly called a liar in front of the team by Mr. Locke, who would leave rooms Plaintiff entered, announcing that he could not be around her;

c. Being made the subject of an investigation in which she was never interviewed or informed of the allegations against her, and being ostracized on the basis of the resulting false narrative;

d. Being required to "prove" her autism to Consumers Energy;

e. Being followed around Consumers Energy's facility by facilities staff;

f. Repeated, unexplained failures of master images controlled by Mr. Dykstra that targeted Plaintiff's work, and Mr. Dykstra's false public statement blaming Plaintiff for those failures;

g. Mr. Garant screaming during a call regarding Plaintiff's situation; and

h. Being counseled, criticized, and warned of discipline for the manifestations of her disabilities, and being "caution[ed]" against complaining about her supervisor.

120. The harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. It caused Plaintiff to fear for her safety in the workplace, required increases in her anxiety medication, required sleep medication, and precipitated an autistic meltdown.

121. Consumers Energy is liable for the hostile work environment because the harassment was perpetrated in part by Plaintiff's supervisor, Mr. Garant, and culminated in tangible employment actions including Plaintiff's negative evaluation and termination; and because Consumers Energy, through Mr. Garant, Ms. Williams, Ms. Scott, and Mr. Beechey, knew or should have known of the co-worker harassment and failed to take prompt and appropriate remedial action.

122. Consumers Energy acted with malice or with reckless indifference to Plaintiff's federally protected rights.

123. As a direct and proximate result of Consumers Energy's unlawful conduct, Plaintiff has suffered the damages described herein.

124. As a result of Consumers Energy's unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both in the past and in the future;

b. Loss of the value of benefits, including health insurance and retirement benefits, both in the past and in the future;

c. Loss of earning capacity;

d. Loss of employment and business opportunities;

e. Non-economic damages including without limitation damages for mental anguish, anxiety, stress, humiliation, embarrassment, exacerbation of her medical conditions, and damage to reputation;

f. Other injuries and damages that become known through the discovery process.

125. Plaintiff also seeks equitable relief, including back-pay, front-pay or reinstatement, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendant Consumers Energy Company in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, exemplary and punitive damages, and attorney fees as allowed by law.

**COUNT IV**
**RETALIATION AND INTERFERENCE**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12203**
**(AGAINST DEFENDANT CONSUMERS ENERGY COMPANY)**

126. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

127. The ADA prohibits an employer from discriminating against any individual because she has opposed any act or practice made unlawful by the ADA or made a charge or participated in an investigation under the ADA. 42 U.S.C. § 12203(a). The ADA further makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of her having exercised or enjoyed, any right granted or protected by the ADA. 42 U.S.C. § 12203(b).

128. Plaintiff engaged in activity protected by the ADA, including without limitation:

a. Requesting reasonable accommodations in April 2025, July 2025, and September 2025;

b. Complaining to People & Culture and Ethics & Compliance in June 2025 of disability discrimination, harassment, and retaliation;

c. Complaining to Ms. Williams on July 15, 2025, that her autism was being used as a "convenient vehicle" to avoid addressing the hostile environment;

d. Escalating the mistreatment she was experiencing and the conduct of Mr. Garant to Vice President Beechey in September 2025 and again on November 18, 2025;

e. Opposing the September 17, 2025 counseling in writing as retaliatory and as penalizing disability-related conduct;

f. Complaining on November 18, 2025, that the counseling and the MRV treatment were retaliation for protected activity; and

g. Complaining to IT Director Scott and to People & Culture on January 15, 2026, including in her 9:42 p.m. email, that she was being retaliated against for reporting Mr. Garant.

129. Consumers Energy had knowledge of Plaintiff's protected activity.

130. Consumers Energy took materially adverse actions against Plaintiff because of her protected activity, including without limitation issuing the September 17, 2025 counseling; warning her of discipline; denying her the title change and associated salary increases afforded to others affected by the MRV change; modifying her performance goals to impose an unattainable deadline; issuing her a

"Needs Improvement" rating; terminating her employment the morning after her January 15, 2026 complaint of retaliation; and declaring her ineligible for rehire.

131. A causal connection exists between Plaintiff's protected activity and Consumers Energy's adverse actions, as demonstrated by, among other things, the close temporal proximity between them, including the issuance of Plaintiff's first-ever counseling approximately two weeks after her escalation to the Vice President and her termination the morning after her written complaint of retaliation; and by Consumers Energy's own documents, which faulted Plaintiff for having "questioned compliance processes," "[q]uestioned the legitimacy of compliance investigations," "[e]xpressed skepticism about investigation fairness," and "express[ed] concerns about fairness."

132. Consumers Energy further coerced, intimidated, threatened, and interfered with Plaintiff's exercise of her ADA rights by, among other things, warning her that her disability-related conduct "could lead to disciplinary action" in the same communication in which it responded to her accommodation request, and by "caution[ing]" her against continuing to raise concerns about her supervisor.

133. The reasons Consumers Energy has articulated for its actions are false and a pretext for unlawful retaliation.

134. As a direct and proximate result of Consumers Energy's unlawful conduct, Plaintiff has suffered the damages described herein.

135. As a result of Consumers Energy's unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both in the past and in the future;

b. Loss of the value of benefits, including health insurance and retirement benefits, both in the past and in the future;

c. Loss of earning capacity;

d. Loss of employment and business opportunities;

e. Non-economic damages including without limitation damages for mental anguish, anxiety, stress, humiliation, embarrassment, exacerbation of her medical conditions, and damage to reputation;

f. Other injuries and damages that become known through the discovery process.

136. Plaintiff also seeks equitable relief, including back-pay, front-pay or reinstatement, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendant Consumers Energy Company in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with

interest, costs, exemplary and punitive damages, and attorney fees as allowed by law.

**COUNT V**
**DISABILITY DISCRIMINATION**
**VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT**
**MCL 37.1101, ET SEQ.**
**(AGAINST ALL DEFENDANTS)**

137. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

138. At all times relevant hereto, Plaintiff was an employee of Consumers Energy, and each Defendant was an "employer" within the meaning of the Michigan Persons with Disabilities Civil Rights Act, MCL 37.1101 et seq. ("PWDCRA").

139. Plaintiff has a "disability" within the meaning of MCL 37.1103(d), in that she has determinable physical and mental characteristics, ASD and CPTSD, that substantially limit one or more of her major life activities and that, with or without accommodation, are unrelated to her ability to perform the duties of her position; she has a history of such characteristics; and Consumers Energy regarded her as having such characteristics.

140. The PWDCRA prohibits an employer from discharging or otherwise discriminating against an individual with respect to compensation or the terms,

conditions, or privileges of employment because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position. MCL 37.1202(1)(b).

141. Defendants discriminated against Plaintiff because of her disability in the manner set forth in Count I and elsewhere in this Complaint, including by terminating her employment, issuing her a "Needs Improvement" rating, denying her a title change and salary increases, and modifying her performance goals.

142. Defendant Garant is an "employer" within the meaning of MCL 37.1201(b), which includes an agent of the employer, and is individually liable under the PWDCRA for his direct participation in the unlawful conduct described herein, including authoring and delivering the September 17, 2025 counseling, modifying Plaintiff's performance goals, authoring the 2025 PEFD, and signing and delivering the letter terminating Plaintiff's employment.

143. Plaintiff's disability was a determining factor in Defendants' adverse employment actions, and Defendants' stated reasons for those actions are pretextual.

144. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered the damages described herein.

145. As a result of Defendants' unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both in the past and in the future;

b. Loss of the value of benefits, including health insurance and retirement benefits, both in the past and in the future;

c. Loss of earning capacity;

d. Loss of employment and business opportunities;

e. Non-economic damages including without limitation damages for mental anguish, anxiety, stress, humiliation, embarrassment, exacerbation of her medical conditions, and damage to reputation;

f. Other injuries and damages that become known through the discovery process.

146. Plaintiff also seeks equitable relief, including back-pay, front-pay or reinstatement, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, exemplary damages, and attorney fees as allowed by law.

## COUNT VI
## FAILURE TO ACCOMMODATE
## VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT
## MCL 37.1102 AND MCL 37.1210
## (AGAINST DEFENDANT CONSUMERS ENERGY COMPANY)

147. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

148. The PWDCRA requires an employer to accommodate a person with a disability for purposes of employment unless the employer demonstrates that the accommodation would impose an undue hardship. MCL 37.1102(2).

149. Plaintiff notified Consumers Energy in writing of her need for accommodation within 182 days after she knew or reasonably should have known that an accommodation was needed, as required by MCL 37.1210(18), including through her written accommodation requests submitted through Alight, her provider's May 2, 2025 certification, her July 15, 2025 written communications to Ms. Williams, her September 2025 written rebuttal, and her September 22, 2025 written request.

150. Consumers Energy failed to accommodate Plaintiff's disability in the manner set forth in Count II and elsewhere in this Complaint.

151. The accommodations Plaintiff requested were reasonable and would not have imposed an undue hardship on Consumers Energy.

152. As a direct and proximate result of Consumers Energy's unlawful conduct, Plaintiff has suffered the damages described herein.

153. As a result of Consumers Energy's unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both in the past and in the future;

b. Loss of the value of benefits, including health insurance and retirement benefits, both in the past and in the future;

c. Loss of earning capacity;

d. Loss of employment and business opportunities;

e. Non-economic damages including without limitation damages for mental anguish, anxiety, stress, humiliation, embarrassment, exacerbation of her medical conditions, and damage to reputation;

f. Other injuries and damages that become known through the discovery process.

154. Plaintiff also seeks equitable relief, including back-pay, front-pay or reinstatement, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendant Consumers Energy Company in whatever amount the Court or jury determines to be fair, just,

and adequate compensation for the injuries and damages sustained, together with interest, costs, exemplary and punitive damages, and attorney fees as allowed by law.

**COUNT VII**
**HOSTILE WORK ENVIRONMENT / DISABILITY HARASSMENT**
**VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT**
**MCL 37.1101, ET SEQ.**
**(AGAINST ALL DEFENDANTS)**

155. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

156. The PWDCRA prohibits an employer from subjecting an employee to unwelcome conduct or communication based on disability that has the purpose or effect of substantially interfering with the employee's employment or creating an intimidating, hostile, or offensive work environment.

157. As set forth in Count III and elsewhere in this Complaint, Plaintiff was subjected to unwelcome conduct and communication because of her disabilities that substantially interfered with her employment and created an intimidating, hostile, and offensive work environment.

158. Consumers Energy is liable for the hostile work environment because the harassment was perpetrated in part by Plaintiff's supervisor and culminated in tangible employment actions, and because Consumers Energy had actual and

constructive notice of the harassment and failed to take prompt and adequate remedial action.

159. Defendant Garant is individually liable under the PWDCRA as an agent of Consumers Energy for his direct participation in creating and maintaining the hostile work environment, including repeating the false narrative that Plaintiff was a "liar," screaming during a call regarding Plaintiff's situation, failing to implement the limitation on Plaintiff's contact with Mr. Dykstra to which he had agreed, and counseling and criticizing Plaintiff for the manifestations of her disabilities.

160. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered the damages described herein.

161. As a result of Defendants' unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both in the past and in the future;

b. Loss of the value of benefits, including health insurance and retirement benefits, both in the past and in the future;

c. Loss of earning capacity;

d. Loss of employment and business opportunities;

e. Non-economic damages including without limitation damages for mental anguish, anxiety, stress, humiliation, embarrassment, exacerbation of her medical conditions, and damage to reputation;

f. Other injuries and damages that become known through the discovery process.

162. Plaintiff also seeks equitable relief, including back-pay, front-pay or reinstatement, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, exemplary damages, and attorney fees as allowed by law.

## COUNT VIII
## RETALIATION
## VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT
## MCL 37.1602
## (AGAINST ALL DEFENDANTS)

163. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

164. The PWDCRA prohibits a person from retaliating or discriminating against a person because the person has opposed a violation of the Act, and from coercing,

intimidating, threatening, or interfering with a person in the exercise or enjoyment of rights granted or protected by the Act. MCL 37.1602(a) and (c).

165. Plaintiff engaged in activity protected by the PWDCRA in the manner set forth in Count IV and elsewhere in this Complaint, including by requesting accommodations and by repeatedly opposing disability discrimination, harassment, and retaliation.

166. Defendants knew of Plaintiff's protected activity and, because of that activity, subjected Plaintiff to the adverse employment actions set forth in Count IV, including terminating her employment the morning after her written complaint of retaliation.

167. MCL 37.1602 applies to any "person," and Defendant Garant is individually liable for his own retaliatory conduct, including issuing the September 17, 2025 counseling approximately two weeks after Plaintiff escalated her complaints about him to the Vice President, modifying her performance goals, issuing the "Needs Improvement" rating, and signing the termination letter the morning after Plaintiff complained in writing that she was being retaliated against for reporting him.

168. Defendants further coerced, intimidated, threatened, and interfered with Plaintiff's exercise of her rights under the PWDCRA in the manner set forth in Count IV.

169. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered the damages described herein.

170. As a result of Defendants' unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both in the past and in the future;

b. Loss of the value of benefits, including health insurance and retirement benefits, both in the past and in the future;

c. Loss of earning capacity;

d. Loss of employment and business opportunities;

e. Non-economic damages including without limitation damages for mental anguish, anxiety, stress, humiliation, embarrassment, exacerbation of her medical conditions, and damage to reputation;

f. Other injuries and damages that become known through the discovery process.

171. Plaintiff also seeks equitable relief, including back-pay, front-pay or reinstatement, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and

adequate compensation for the injuries and damages sustained, together with interest, costs, exemplary damages, and attorney fees as allowed by law.

## COUNT IX
## SEX DISCRIMINATION
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
## MCL 37.2101, ET SEQ.
## (AGAINST ALL DEFENDANTS)

172. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

173. At all times relevant hereto, Plaintiff was an employee of Consumers Energy, and each Defendant was an "employer" within the meaning of the Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq. ("ELCRA"), which defines "employer" to include an agent of the employer. MCL 37.2201(a).

174. The ELCRA prohibits an employer from discharging, or otherwise discriminating against, an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of sex. MCL 37.2202(1)(a).

175. As set forth in the General Allegations above, Defendants discriminated against Plaintiff because of her sex, including by subjecting her to the September 17, 2025 counseling, denying her a title change and eligibility for salary increases, modifying her performance goals, rating her "Needs Improvement," and terminating her employment, while treating similarly situated male employees more favorably and evaluating Plaintiff through sex-based stereotypes.

176. Plaintiff's sex was a factor that made a difference in Defendants' decisions, and Defendants' stated reasons for those decisions are pretextual.

177. Defendant Garant is individually liable under the ELCRA for his direct participation in the discriminatory conduct, including authoring and delivering the counseling, modifying Plaintiff's goals, authoring the 2025 PEFD, and signing and delivering the termination letter. *Elezovic v Ford Motor Co*, 472 Mich 408 (2005).

178. Consumers Energy is liable for the discriminatory conduct of Defendant Garant, its agent and Plaintiff's supervisor, undertaken in the course of his employment.

179. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered the damages described herein.

180. As a result of Defendants' unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both in the past and in the future;

b. Loss of the value of benefits, including health insurance and retirement benefits, both in the past and in the future;

c. Loss of earning capacity;

d. Loss of employment and business opportunities;

e. Non-economic damages including without limitation damages for mental anguish, anxiety, stress, humiliation, embarrassment, exacerbation of her medical conditions, and damage to reputation;

f. Other injuries and damages that become known through the discovery process.

181. Plaintiff also seeks equitable relief, including back-pay, front-pay or reinstatement, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, exemplary damages, and attorney fees as allowed by law.

**COUNT X**
**AGE DISCRIMINATION**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**MCL 37.2101, ET SEQ.**
**(AGAINST ALL DEFENDANTS)**

182. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

183. At all times relevant hereto, Plaintiff was an employee of Consumers Energy, and each Defendant was an "employer" within the meaning of the Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq. ("ELCRA"), which defines "employer" to include an agent of the employer. MCL 37.2201(a).

184. The ELCRA prohibits an employer from discharging, or otherwise discriminating against, an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of age. MCL 37.2202(1)(a).

185. As set forth in the General Allegations above, Defendants discriminated against Plaintiff because of her age, including by denying her a title change and eligibility for salary increases, rating her "Needs Improvement," and terminating her employment, while treating substantially younger employees more favorably and evaluating Plaintiff through age-based stereotypes.

186. Plaintiff's age was a factor that made a difference in Defendants' decisions, and Defendants' stated reasons for those decisions are pretextual.

187. Defendant Garant is individually liable under the ELCRA for his direct participation in the discriminatory conduct, including authoring the 2025 PEFD and signing and delivering the termination letter. *Elezovic v Ford Motor Co*, 472 Mich 408 (2005).

188. Consumers Energy is liable for the discriminatory conduct of Defendant Garant, its agent and Plaintiff's supervisor, undertaken in the course of his employment.

189. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered the damages described herein.

190. As a result of Defendants' unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both in the past and in the future;

b. Loss of the value of benefits, including health insurance and retirement benefits, both in the past and in the future;

c. Loss of earning capacity;

d. Loss of employment and business opportunities;

e. Non-economic damages including without limitation damages for mental anguish, anxiety, stress, humiliation, embarrassment, exacerbation of her medical conditions, and damage to reputation;

f. Other injuries and damages that become known through the discovery process.

191. Plaintiff also seeks equitable relief, including back-pay, front-pay or reinstatement, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, exemplary damages, and attorney fees as allowed by law.

## COUNT XI
## VIOLATION OF THE BULLARD-PLAWECKI EMPLOYEE RIGHT TO KNOW ACT MCL 423.501, ET SEQ.
## (AGAINST DEFENDANT CONSUMERS ENERGY COMPANY)

192. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

193. Plaintiff is a former "employee," and Consumers Energy is an "employer," within the meaning of the Bullard-Plawecki Employee Right to Know Act, MCL 423.501 et seq. (the "Act").

194. Upon written request, an employer must provide an employee or former employee with a copy of all or part of the employee's personnel record. MCL 423.503 and 423.504. A "personnel record" includes any record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used, relative to the employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action. MCL 423.501(2)(c).

195. On January 23, 2026, Plaintiff, through counsel, made a written request for a complete copy of her personnel record.

196. Consumers Energy violated the Act by failing to provide Plaintiff with a complete copy of her personnel record, including the records described in this Complaint that Consumers Energy omitted from its February 19, 2026 production.

197. Upon information and belief, Consumers Energy's violation of the Act was willful and knowing.

198. Pursuant to MCL 423.502, personnel record information that was not included in the personnel record but should have been included as required by the Act shall not be used by Consumers Energy in this proceeding.

199. Pursuant to MCL 423.511, Plaintiff is entitled to an order compelling Consumers Energy's compliance with the Act, her actual damages and costs, and, for Consumers Energy's willful and knowing violation, reasonable attorney fees and the imposition of the statutory fine.

WHEREFORE, Plaintiff prays that this Court enter an order compelling Consumers Energy to produce Plaintiff's complete personnel record; precluding Consumers Energy from using in this proceeding any personnel record information that was not included in its production; and awarding Plaintiff her actual damages, costs, and reasonable attorney fees, together with the statutory fine, as allowed by MCL 423.511.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: November 6, 2026

Respectfully submitted,

DILLON & DILLON, P.L.C.

/s/ Paul J. Dillon
Paul J. Dillon (P46913)
9429 S. Main Street
Plymouth, MI 48170
(734) 455-9000
pjdillon@ddplc.net
Attorney for Plaintiff